# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-70002

United States Court of Appeals
Fifth Circuit

**FILED**

April 23, 2021

Lyle W. Cayce
Clerk

ANDRE LEE THOMAS,

      Petitioner - Appellant

v.

BOBBY LUMPKIN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

      Respondent - Appellee

---

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:09-CV-644

---

Before JONES, SOUTHWICK, and HIGGINSON, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Andre Lee Thomas, an inmate on death row in Texas, filed a federal *habeas* application, arguing that his counsel was constitutionally ineffective in numerous ways at trial and sentencing. We granted a certificate of appealability on four of Thomas's issues. We now AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 27, 2004, Andre Lee Thomas broke into the Sherman, Texas apartment of his estranged wife, Laura Christine Boren. He stabbed his wife; their four-year-old son, Andre Lee Boren; and one-year-old Leyha Marie

No. 17-70002

Hughes, Thomas's stepdaughter. All three were killed. He then used separate knives on each victim and attempted to remove their hearts, leaving gaping wounds in their chests. He believed that by taking their hearts he would "set them free from evil." He also stabbed himself three times, but his injuries were not fatal. Thomas left the apartment shortly thereafter. Later that day, he went to the Sherman police station and confessed.

In June 2004, Thomas was indicted for the capital murder of Leyha Marie Hughes, his stepdaughter. He was assigned R.J. Hagood and Bobbie Peterson as counsel. While awaiting trial, Thomas removed one of his eyeballs. Years later, he would remove the other and eat it. At trial, Thomas pled not guilty by reason of insanity, arguing that his actions were because of an acute psychosis resulting from lifelong mental illness. The State agreed that Thomas was psychotic but argued his psychosis was voluntarily induced just before the killings through ingestion of the cough medicine Coricidin. The State presented expert testimony that high doses of Coricidin can cause irrational behavior. There is no doubt that Thomas has significant emotional and mental problems. Their effect on his conviction is a central issue in this appeal.

In March 2005, an all-white jury found Thomas guilty of capital murder and sentenced him to death. Another significant issue for us is the sufficiency of the questioning of jurors on their views about interracial marriage, relevant because Thomas is a black man and his wife was a white woman.

Greater detail about Thomas's killing of his wife and the children, and about the trial, is in the opinion affirming his conviction on appeal. *Thomas v. State*, No. AP–75,218, 2008 WL 4531976 (Tex. Crim. App. Oct. 8, 2008).

While his first appeal was pending, Thomas also brought claims under state *habeas corpus* procedures. As required under Texas law, Thomas's application for relief was filed in the court of conviction. On March 28, 2008, that court recommended findings and conclusions for consideration by the

2

No. 17-70002

Texas Court of Criminal Appeals. *See* TEX. CODE CRIM. PROC. art. 11.071, §§ 9(f), 11. On March 18, 2009, the Court of Criminal Appeals "adopt[ed] the trial judge's findings and conclusions" and denied all relief. *Ex parte Thomas*, No. WR–69,859-01, 2009 WL 693606, at *1 (Tex. Crim. App. Mar. 18, 2009).

Thomas filed a federal *habeas* application under 28 U.S.C. § 2254. On September 19, 2016, the United States District Court, in a 128-page opinion, analyzed and rejected all claims. *Thomas v. Director, TDCJ-CID*, No. 4:09-cv-644, 2016 WL 4988257, at *1 (E.D. Tex. Sept. 19, 2016) (on Westlaw, the entire opinion is 86 pages). The district court also denied Thomas's application for a certificate of appealability ("COA"). *Id.* at *86. Thomas filed a timely motion under Rule 59(e) to alter or amend judgment, but the motion was denied on December 13, 2016. On January 11, 2017, Thomas filed a notice of appeal.

We granted Thomas's motion for a COA on four issues. *Thomas v. Davis*, 726 F. App'x 243 (5th Cir. 2018). We will analyze each of them. After the initial briefing and just before oral argument, the State submitted notice to the court of a possible jurisdictional defect in the appeal. We must address jurisdiction and do so first.

## DISCUSSION

### I.     *Potentially late notice of appeal*

This appeal fails if the State's late-discovered possible defect in our jurisdiction proves valid. The question posed was whether Thomas's notice of appeal was untimely. Our answer depends on whether Thomas's earlier Rule 59(e) motion, which was filed before the deadline for a notice of appeal, tolled the time for filing the appeal. The answer to that is governed by whether it is appropriate for the court to examine a Rule 59(e) motion to alter or amend a judgment with the same attention to detail as is required for examining a Rule 60(b) motion. We must review Rule 60(b) motions to see if they are in fact

though not in form successive applications under Section 2244(b), in which new claims are presented instead of alleged mistakes, or fraud, or new evidence, or some other valid basis under Rule 60(b). *See Gonzalez v. Crosby*, 545 U.S. 524, 532–34 (2005). We extended the Supreme Court's reasoning to motions under Rule 59(e). *See Williams v. Thaler*, 602 F.3d 291, 302–04 (5th Cir. 2010). Based on *Williams*, the State in a Rule 28(j) letter argued that we lacked jurisdiction because Thomas's Rule 59(e) motion to alter or amend the district court's judgment was in fact a successive *habeas* application and did not suspend the time to file the notice of appeal. FED. R. APP. P. 4.

We were wrong in *Williams*. After the Rule 28(j) letter was submitted, the Supreme Court held that Rule 59(e) motions should not be recategorized as successive applications regardless of their contents. *Banister v. Davis*, 140 S. Ct. 1698, 1711 (2020). Thomas's notice of appeal was timely, and we have jurisdiction.

## II.     *Federal court review of state court decisions*

To obtain *habeas* relief, the prisoner must show that the state court's decision "(1) . . . was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). A state court's decision is contrary to clearly established precedent if the rule it applies "contradicts the governing law set forth in the Supreme Court's cases," or if the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court yet reaches a different result. *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010) (brackets omitted). If fair-minded jurists could disagree about whether the state court's decision was correct, deference under the Antiterrorism and Effective Death Penalty

Act ("AEDPA") precludes federal *habeas* relief. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). This deference has also been said to require that a state court's legal conclusion "must be more than merely incorrect in order to constitute an unreasonable application of federal law; it must be objectively unreasonable." *Miller v. Dretke*, 420 F.3d 356, 360 (5th Cir. 2005). We presume the state court's factual findings are correct unless rebutted with clear and convincing evidence. *Wooten*, 598 F.3d at 218.

The standard of review becomes doubly deferential when, as in most of the claims raised here, the petitioner is seeking *habeas* relief for ineffective assistance of counsel. *Richter*, 562 U.S. at 105. "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 101. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. To obtain federal *habeas* relief, the petitioner must prove that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for" reasonable disagreement. *Id.* at 103.

The prisoner must prove both deficient performance and prejudice to succeed on a claim for ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 697 (1984). An attorney's performance is deficient if it falls "below an objective standard of reasonableness." *Id.* at 688. A petitioner is prejudiced if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. There is a strong presumption that defense counsel's strategic and tactical decisions are "within the wide range of reasonable professional assistance." *Id.* at 689.

No. 17-70002

III.    *Claims allowed by the certificate of appealability*

We granted a COA on four claims, which we will discuss in the following order: (A) the jury was tainted with racial bias, and the state court unreasonably held that defense counsel provided effective assistance during *voir dire*; (B) the state court unreasonably held that defense counsel provided effective assistance despite their failure to challenge Thomas's competency to stand trial; (C) the state court unreasonably held that defense counsel provided effective assistance despite their failure to present an expert in pharmacology to rebut the State's evidence that Thomas's psychosis was voluntarily induced; and (D) the state court unreasonably held that defense counsel provided effective assistance, despite their failure to prepare and present an effective mitigation case at sentencing.  *Thomas*, 726 F. App'x at 243.

A.    *Racial bias on jury*

We granted a COA on a two-part claim regarding racial bias, that "the jury was tainted with racial bias, and the state court unreasonably held that defense counsel provided effective assistance during *voir dire*, despite their failure to challenge the biased jurors."  Though the claims are related and merged at times in briefing, to the extent possible we analyze them separately.

1.    *Was the jury tainted with racial bias?*

Thomas emphasizes to this court that "his jury included three jurors who admitted that they harbored bias against 'people of different racial backgrounds marrying and/or having children.'"  As we previously discussed, attitudes about interracial marriage were explored because the defendant Thomas, who is a black man, married Laura Christine Boren, a white woman. Though Thomas killed his wife and their own interracial child, Andre Jr., the murder for which he was tried was that of Leyha Marie, his wife's child by her later relationship.  The briefing does not indicate the race of that victim, nor

6

does it raise any issues about race having affected the trial beyond juror attitudes about an interracial marriage and the couple having a child together.

Evidence on this claim comes both from answers on a jury questionnaire and from *voir dire*. The following are the relevant parts of the questionnaire:

103. What is your church or spiritual affiliation's position on interracial marriages?

104. Do you (___) Agree or (___) Disagree with this position? Please tell us why you feel this way:

105. The Defendant in this case, Andre Thomas, and his ex-wife, Laura Boren Thomas, are of different racial backgrounds. Which of the following best reflects your feelings or opinions about people of different racial backgrounds marrying and/or having children:

(___) I vigorously oppose people of different racial backgrounds marrying and/or having children and am not afraid to say so.

(___) I oppose people of different racial backgrounds marrying and/or having children, but I try to keep my feelings to myself.

(___) I do not oppose people of different racial backgrounds marrying or being together, but I do oppose them having children.

(___) I think people should be able to marry or be with anyone they wish.

PLEASE TELL US WHY YOU FEEL THIS WAY: [blank provided].

The only one of the three contested jurors to check the first block on Question 105 was Marty Ulmer, indicating he "vigorously oppose[d] people of different racial backgrounds marrying and/or having children and [was] not afraid to say so." In the blank provided for explanation, he wrote that he did not "believe God intended for this."

Ulmer was the only one of those three jurors who was questioned on *voir dire* specifically about racial attitudes. Counsel asked how Ulmer would feel

about sitting on a capital case where the black male defendant was accused of killing his wife, a white female. He answered,

> Well, I think — I think it's wrong to have those relationships, my view, but we are all human beings and God made every one of us. And, you know, as far as — I don't care if it is white/white, black/black, that don't matter to me. If you've done it, you are a human being, you have got to own up to your responsibility.
>
> Q. So, the color of anyone's skin would not have any impact or bearing upon your deliberations?
>
> A. No, not according to that, no.
>
> Q. Okay.
>
> A. Not whether they were guilty or innocent.

Defense counsel then asked again whether Ulmer would take into account the defendant's or victim's race in deciding whether to impose the death penalty. Ulmer answered: "No, I wouldn't judge a man for murder or something like that according to something like that, no, I would not."

Another juror, Charles Copeland, checked the option on the questionnaire that his church's position was that there "should not be" interracial marriage, and Copeland indicated he agreed with that view. In response to Question 105, Copeland checked the option that he "oppose[d] people of different racial backgrounds marrying and/or having children, but [he] tr[ied] to keep [his] feelings to [himself]." Copeland was not specifically questioned about these answers. When the court asked him during *voir dire* if he could "make up [his] mind solely upon the evidence" presented, Copeland answered that he could.

The final relevant juror is Barbara Armstrong. She indicated that her church or spiritual affiliation did not have a position on interracial marriage, and she added: "It is not the church['s] place to have a position on matters such as this." Like Copeland, she checked the option on Question 105 that she opposed interracial marriage and such couples having children but tried to

keep those feelings to herself.  She added her own explanation: "I think it is harmful for the children involved because they do not have a specific race to belong to."  Armstrong was not questioned about her answers at *voir dire*.   The court asked whether she could assess the case based only on the evidence presented in the courtroom, and she stated that she could.

All three of those jurors were accepted, as defense counsel made neither a for-cause nor a peremptory challenge to exclude any of them.  There was also an alternate juror who expressed misgivings about interracial marriage, but because she was dismissed before deliberations began, we do not discuss her.

Thomas also refers us to one final piece of evidence related to juror bias. As the prosecutor completed his argument before jurors began their deliberations on Thomas's sentence, he may have alluded to race:

> Are you going to take the risk about him asking your daughter out, or your granddaughter out? After watching the string of girls that came up here and apparently could talk him into — that he could talk into being with him, are you going to take that chance?

We are uncertain if it is completely fair to characterize this as injecting a racial component into deliberations, in part because we do not know the race of the other witnesses and also because it is the kind of argument that could well be made in a case in which race was not a factor.  Further, Thomas's COA is not broad enough to include a direct challenge to the prosecutor's words or its effect on the trial.

In order to understand the claims about juror racial bias presented in state court, we examine the state *habeas* application.  Counsel filed 44 claims for relief in state court.  The only one relevant for jury bias itself (as opposed to ineffectiveness of counsel on the issue) was Claim 20, which stated that the "presence of jurors opposed to interracial relationships deprived Mr. Thomas of a fair trial."  Thomas argued that the presence of racially biased jurors "raises overwhelming concerns that significant racial bias affected the

decision-making process in Mr. Thomas's capital trial." He also contended it was "highly likely that the views of the four impaneled jurors who opposed interracial marriage prevented or substantially impaired 'the performance of [their] duties as [] juror[s] in accordance with [their] instructions and [their] oath.'"

The only relevant fact findings by the state *habeas* court were these:

> All members of Mr. Thomas's jury were white.
> There is no evidence that the jury's decision was racially motivated.
> No objection was ever made by the Applicant to the purported racial bias of any juror that was seated.

There were no legal conclusions about jury racial bias other than as to the effectiveness of counsel. We will address counsel effectiveness in the next section of the opinion. The above findings and conclusions were adopted by the Court of Criminal Appeals. *Ex parte Thomas*, 2009 WL 693606, at *1.

In his federal *habeas* application, Thomas asserted "there is no requirement that Mr. Thomas show that the jury's decision was racially motivated, as a showing that a jury was not impartial creates a structural error." *See Neder v. United States*, 527 U.S. 1, 8 (1999); *Virgil v. Dretke*, 446 F.3d 598, 607 (5th Cir. 2006).

We begin our analysis of the law with essential points: "blatant racial prejudice is antithetical to the functioning of the jury system." *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 871 (2017). It is undeniable "that discrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice.'" *Id.* at 868 (quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)). Any "defendant has the right to an impartial jury that can view him without racial animus, which so long has distorted our system of criminal justice." *Georgia v. McCollum*, 505 U.S. 42, 58 (1992). If a defendant is denied the right to an impartial decisionmaker, regardless of the nature of the bias,

any subsequent conviction is tainted with constitutional infirmity.  *See Virgil*, 446 F.3d at 607.  Any juror who "the defendant has specific reason to believe would be incapable of confronting and suppressing their racism" should be removed from the jury.  *See McCollum*, 505 U.S. at 58.  If a juror should have been removed for cause, then seating that juror requires reversal.  *United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000).

A defendant's right to an impartial jury, though fundamental, does not mean that jurors who have preconceived notions cannot be validly seated.  To the contrary, as the Supreme Court has instructed:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

Thomas presented his argument on this claim to the state *habeas* court in four short paragraphs.  Quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), he argued that it was "likely that the views of the four impaneled jurors who opposed interracial marriage prevented or substantially impaired 'the performance of [their] duties as a juror in accordance with [their] instructions and [their] oath."

In response to this argument, the state court found "[t]here is no evidence that the jury's decision was racially motivated."  That finding is not directly on point as to whether any juror with a relevant bias that made him or her unable to be impartial was seated on the jury.  Though we can identify no state-court findings directly on the point of whether a biased juror was seated, AEDPA deference may still be owed.  We also apply a presumption of correctness where a "finding was necessarily part of the court's rejection of the defendant's claim."  *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001)

(citing *Marshall v. Lonberger*, 459 U.S. 422, 433 (1983)).  Indeed, "determining whether a state court's decision resulted from an unreasonable . . . factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Richter*, 562 U.S. at 98.  Rather, a federal court will deny *habeas* relief "if there was a reasonable justification for the state court's decision" in the record.  *Id.* at 109.

The issue before us, then, is whether it was "objectively unreasonable" for the state *habeas* court to reject Thomas's claim that his right to an impartial jury was violated.  *See Miller*, 420 F.3d at 360.  In reviewing whether the state court erred when it did not find that someone with disqualifying racial attitudes was seated as a juror, we should consider any "reasonable justification for the state court's decision." *See Richter*, 562 U.S. at 109.  A necessary implicit finding within the state court's explicit finding is that no juror would base his decision on race rather than on the evidence presented. To rephrase, any bias of a juror could be set aside in determining guilt or a punishment.  We now turn to determine whether that finding was "objectively unreasonable." *See Miller*, 420 F.3d at 360.

In evaluating the state *habeas* court's finding and any possible reasonable justifications, we consider the answers Ulmer gave during *voir dire*. The questioning did not cause Ulmer to retreat on his beliefs about interracial marriage.  Still, when asked if "the color of anyone's skin would . . . have any impact or bearing upon [his] deliberations," Ulmer responded, "No, not according to that, no."  He "wouldn't judge a man for murder or something like that according to something like [race], no, I would not."  Ulmer also said that he didn't "care if it was white/white, black/black, that don't matter."

On that record, the state court found "no evidence that the jury's decision was racially motivated."  We consider it a reasonable understanding of that finding that Ulmer's answers, if accepted as true, which the state *habeas* court

was entitled to do, were clear that his moral judgment would not affect his fact finding.    That would mean that whatever biases this juror brought to deliberations, they were not ones that would affect his decision on guilt, innocence, or the ultimate penalty; he certainly stated they would not.  *See Irvin*, 366 U.S. at 723 ("It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."). We conclude that the state *habeas* court's finding that Ulmer could serve as an impartial juror was not objectively unreasonable.

We now consider the other two relevant jurors.  Armstrong and Copeland disapproved of interracial marriage but not "vigorously," and they liked to keep such opinions to themselves.  After Ulmer, who was "vigorously oppose[d]" to interracial marriage, agreed that he could set aside his opinions in determining guilt, innocence, or a punishment, defense counsel did not question Armstrong or Copeland about their views on interracial marriage.

Thomas's argument that racially biased jurors were seated is unavoidably linked to his claim that counsel was ineffective in its handling of those jurors at *voir dire*.  Despite our efforts to divide our analysis between the two, there is inevitable overlap:  a counsel's failure to object to the seating of a juror who expressed an inability to be impartial is ineffective assistance.  *See Virgil*, 446 F.3d at 613–614.  Here, of course, these two members of the venire did not make an "unequivocal express[ion] that they could not sit as fair and impartial jurors." *See id.* at 613.  We cannot say based on these questionnaire answers alone that the state *habeas* court was objectively unreasonable in concluding that Armstrong and Copeland decided the case solely on the evidence presented.  A different subject is whether their questionnaire answers expressed a view that required Thomas's counsel to question them in *voir dire*, as was done for Ulmer.  To the extent the issue is whether Armstrong and Copeland could be seated without some further probing by counsel into their

potential partiality, that is a claim about ineffective representation. We address that point in the next section.

A few final points about the law. We agree with the dissent that Thomas has a Sixth Amendment right to an impartial jury without overt racial bias. We interpret the dissent as concluding that Ulmer could not be seated because of his questionnaire answers showing his opposition to interracial marriage. We disagree because we find no clearly established law from the Supreme Court that the state *habeas* court's decision contravened. We have already discussed Supreme Court decisions that jurors who are "incapable of confronting and suppressing their racism" should be removed from the jury. *See McCollum*, 505 U.S. at 58. That is not the same thing as saying any juror who has expressed even strong opposition to interracial marriage cannot be seated in a case involving a defendant who did marry someone of a different race if the person indicates an ability to confront and suppress those opinions.

We conclude that fair-minded jurists could disagree about whether the state court's decision was correct as to jury bias, which means that AEDPA deference is owed that decision. *Richter*, 562 U.S. at 101. Thomas is not entitled to relief on the basis that the state court improperly resolved the claim that any partial jurors were seated.

### 2. *Was defense counsel ineffective in addressing jury bias?*

The second issue arising from the jury service of Ulmer, Copeland, and Armstrong concerns possible ineffective assistance of counsel. This was Claim 21 in Thomas's state *habeas* application. Thomas argues that defense counsel's representation in jury selection was deficient because "[n]o reasonable lawyer would have allowed multiple jurors who openly admitted moral opposition to interracial relationships to be seated in a capital trial of a black defendant accused of murdering his white wife and interracial child." At the very least, Thomas contends that defense counsel should have questioned "them

regarding their biases." He asserts that defense counsel asked only minimal questions of one juror and none of the other two. He claims that the "white jurors here admittedly harbored a specific bias against black men like Thomas who disobeyed 'God['s] intent[ions]' and muddied white 'bloodline[s]' by marrying and having children with a white woman." Prejudice, Thomas argues, resulted from what was unknown about the jurors' biases. The state *habeas* court determined that Thomas "failed to overcome the presumption that trial counsel was effective during *voir dire* questioning." The court made no explicit factual findings to support that conclusion.

The issue before this court is whether it was objectively unreasonable for the state *habeas* court to conclude that defense counsel's representation during *voir dire* was constitutionally adequate. *See Richter*, 562 U.S. at 102–03. In making that determination, we look for any "reasonable justification for the state court's decision." *See id.* at 109. A presumption of correctness "not only applies to explicit findings of fact [by a state *habeas* court], but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez*, 274 F.3d at 948 n.11.

Certainly, the jury was questioned about racial prejudice in the context of this case. All prospective jurors were asked about racial bias, at least in the questionnaires. They knew this case involved an interracial marriage. The relevant question is whether defense counsel should have probed further during *voir dire* any juror whose written answers were concerning.

Defense counsel questioned Ulmer specifically on his beliefs about interracial marriage. The questioning did not cause Ulmer to retreat on his beliefs about such marriages, but when asked if "the color of anyone's skin would . . . have any impact or bearing upon [his] deliberations," Ulmer responded, "No, not according to that, no." He stated that he "wouldn't judge a man for murder or something like that according to something like [race], no,

I would not." Ulmer also said that he didn't "care if it was white/white, black/black, that don't matter." Under our "doubly deferential" review, *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011), the questioning of Ulmer was sufficient, and the state *habeas* court was not objectively unreasonable when it concluded that Thomas did not rebut the presumption of counsel's effectiveness as to Ulmer.

We turn next to Copeland and Armstrong. The only *voir dire* supplementation of information about Armstrong's and Copeland's attitudes and impartiality was the trial judge's eliciting that each of them could decide the case solely on the evidence presented to them at trial. The Supreme Court has observed that "[g]eneric questions about juror impartiality may not expose specific attitudes or biases that can poison jury deliberations. Yet more pointed questions 'could well exacerbate whatever prejudice might exist without substantially aiding in exposing it.'" *Pena-Rodriguez*, 137 S. Ct. at 869 (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 195 (1981) (Rehnquist, J., concurring in result)). We do not interpret that language as invalidating the generic questioning of Armstrong and Copeland. It does, however, demonstrate the difficulty for counsel.

The state *habeas* court made no specific factual findings relevant to jurors Armstrong and Copeland and the effectiveness of counsel regarding them. The following legal conclusions are on point (we have omitted the numerous citations to state court decisions):

> A trial court has wide discretion in conducting *voir dire*, and its rulings are reviewed under an abuse of discretion standard. If the subject could possibly be raised during trial, the attorneys are entitled to *voir dire* on that issue. Generally speaking, a *voir dire* topic is proper if it seeks to discover a juror's views on an issue applicable to the case.
>
> *Strickland* encompasses the prohibition against second-guessing counsel's trial strategy on *voir dire*. Not every attorney

will conduct *voir dire* in the same manner, and, with hindsight, every attorney may have wished that additional questions were asked. However, the fact that another attorney might have pursued other areas of questioning during *voir dire* will not support a finding of ineffective assistance.

The applicant has failed to overcome the presumption that trial counsel was effective during *voir dire* questioning.

The applicant has not demonstrated that his counsel's performance fell below a reasonable objective standard, and he has not demonstrated that any alleged error prejudiced his defense.

The issue of whether the *voir dire* questioning satisfied counsel's obligations is a mixed question of law and fact. *See Strickland*, 466 U.S. at 698. Factually, we know what happened. Counsel each asserted that a balance was struck between the costs and benefits of more specific questioning. We accept that the state court made factual findings to support its rejection of relief. *See Valdez*, 274 F.3d at 948 n.11. The state *habeas* court's legal conclusions, already quoted, emphasize the discretion of counsel on how to proceed with a criminal defense, including the conducting of *voir dir*e. The difficult issue is whether the state court made an unreasonable application of the clearly established law.

The evidence on defense counsel's decisions about *voir dire* and about other issues during trial comes from four affidavits, two from each of the defense attorneys. According to the briefing, the first affidavits from each trial counsel were obtained at the initiative of Thomas's *habeas* counsel, while the second pair was obtained by the State a few months later. In each situation, the procuring party was given affidavits largely supportive of its arguments on the effectiveness of trial counsel. The earlier affidavit of each attorney seems to be describing all that counsel did wrong; the later, the many efforts to do things right. They almost seem to be describing different events. All four affidavits were presented to the state *habeas* court.

The lead attorney was R.J. Hagood.  In his June 2007 affidavit, he stated that his "failure to ask few, if any, follow up questions of the members of the jury who had indicated on their jury questionnaires that they were opposed to interracial marriage was not intentional; I simply didn't do it."  In November 2007, though, Hagood provided an affidavit that said he had carefully considered how to question prospective jurors:

> [Thomas] states that we were ineffective for failing to inquire into the racial bias of each juror.  Strategically, I would never ask pointed questions regarding racial bias from a juror without a real basis to do so.  *Voir dire* can be delicate in that you do not want to alienate a juror who may end up on the jury. Accusing someone of racism is a good way to do that. Nona Dodson had suggested several questions to pose to jurors.  I followed some of her [advice] which, based on many years as a trial attorney, I believed would be useful.  I did not take all of her suggestions.  In fact, I found some of those questions offensive and inappropriate to propound to a rural jury.  I cannot recall any questions suggested by Ms. Dodson that I out-right refused to ask. . . . For those jurors who expressed some problem with interracial relationships, either [co-counsel] Ms. Peterson or I questioned them to the extent necessary for us to request a strike for cause or make a decision to use a strike against them.  Often time, there were much worse jurors upon whom we exercised our strikes.

Co-counsel Bobbie Peterson Cate also submitted two affidavits.  Her June 2007 statement contained nothing about the decision-making for juror questioning.  Her December 2007 affidavit largely mirrored Hagood's on this issue, suggesting careful consideration of how to handle questioning during *voir dire* about racial biases.

These are strikingly different representations, between just not thinking to ask about interracial marriage and making a careful consideration of the issue.  We at least know that sufficient attention was given the issue to create several written questions for prospective jurors about interracial marriage.  Without doubt, though, Armstrong and Copeland were not asked about their

racial attitudes in *voir dire*. It could be, as Hagood asserted in his second affidavit, that he considered the suggested questions, asked some of Ulmer, but decided to ask none of Armstrong and Copeland. Once the juror who more "vigorously oppose[d]" than the other two agreed to set aside his bias, Hagood may have strategically avoided the risk of alienating Armstrong and Copeland.

Hagood also stated in his second affidavit that he had tried many cases in Grayson County, Texas, in which his clients were "black defendants found not guilty by all-white" juries. There could be strategic reasons for not further inquiring into the potential jurors' feelings about race and interracial relationships, and the record supports that Hagood was experienced in dealing with these concerns on *voir dire*. According to his second affidavit, Hagood's decisions were strategic attempts to avoid alienating potential jurors based on his trial experience in rural areas like Grayson County. Certainly, counsel must make difficult tactical judgments.

In considering the effectiveness of counsel, we note the differences between the two who were not questioned, Armstrong and Copeland, and Ulmer, who was. One distinction is that Armstrong and Copeland indicated that they did not like to discuss with others their beliefs about interracial marriage. Copeland and Armstrong also did not indicate that they were "vigorously" opposed to interracial marriage. Finally, Ulmer was questioned and seated before Armstrong and Copeland. We must decide whether the state *habeas* court was objectively unreasonable to find that Thomas had not shown ineffective assistance in deciding not to question or strike Armstrong or Copeland after questioning Ulmer.

Other circuits have emphasized the difficulty defense counsel faces in deciding how to discover potential racial bias without over-emphasizing it. The facts of a Third Circuit capital case involved "an interracial sexual relationship between an African-American man and his white girlfriend" whom the man

killed. *Jacobs v. Horn*, 395 F.3d 92, 98, 119 (3d Cir. 2005). The court analyzed counsel's failure to ask racial-bias questions as being reasonable if counsel "believed that probing the jurors' potential racial prejudices might unduly emphasize the racial differences." *Id.* at 118. The court held there was no counsel ineffectiveness due largely to the fact that the record did not support that race had anything to do with why the defendant killed his girlfriend. *Id.* There is no such evidence here either. *Jacobs* did not discuss the need to inquire about jurors' potential objections to interracial relationships.

Another example is a capital murder trial conducted in Illinois on facts similar to those in *Jacobs*, *i.e.*, the absence of any evidence that there was a racial motive behind a black man's killing of a white victim; there was no questioning of prospective jurors about racial attitudes. *Lear v. Cowan*, 220 F.3d 825, 829 (7th Cir. 2000). The Seventh Circuit found no ineffectiveness in the decision to avoid emphasizing the racial component of the facts, as counsel "testified that he thought he had dealt with the issue adequately by asking general questions about bias without focusing on race." *Id.*

To be clear, the racial issues in the case before us were considered by counsel and the court as more central than in the two decisions we just discussed. Though no briefing here has suggested that Thomas had a racial motive for the killings, the district court agreed that the interracial marriage and the couple having children had potential to affect some jurors' objective view of the evidence and justified questioning the venire.

Nonetheless, these other circuits' opinions support that there is considerable discretion in deciding how much questioning, if any, is required even as to possible racial biases. The Supreme Court has said that "inquiry into racial prejudice at *voir dire* [is] not constitutionally required [when] the facts of the case [do] not suggest a significant likelihood that racial prejudice might infect [the defendant's] trial." *Turner v. Murray*, 476 U.S. 28, 32 (1986)

(third alteration in original) (quotation marks omitted). The *Turner* plurality based its reason for finding *voir dire* inadequate "on a conjunction of three factors: the fact that the crime charged involved interracial violence, the broad discretion given the jury at the death-penalty hearing, and the special seriousness of the risk of improper sentencing in a capital case." *Id.* at 37. We have those three here, but unlike in *Turner*, some questions were asked at this trial about prospective jurors' racial attitudes.

As we discussed in the juror-racial-bias analysis, this case is also different from *Virgil v. Dretke*, in which two jurors "each unequivocally expressed that they could not sit as fair and impartial jurors." 446 F.3d at 613. Failure to challenge for cause or use a peremptory strike was ineffective assistance where counsel also did not question "either [juror] as to whether they would be able to set aside their preconceived notions and adjudicate . . . with an open mind, honestly and competently considering all the relevant evidence." *Id.* If Armstrong and Copeland had unequivocally expressed their inability to remain impartial, this would be an easier case.

We also have AEDPA, under which we show broad, if limited, deference to the decision of the state court. That was not an issue in *Turner*. The limitations are that facts not be unreasonably determined and that the Supreme Court's clearly established law not be unreasonably applied. § 2254(d)(1)–(2).

The jurors were questioned about racial prejudices in their questionnaire, and defense counsel provided a colorable reason not to question further. The state *habeas* court approved. Perhaps it applied *Strickland* incorrectly, but to be reversed, the state court must have erred unreasonably.

As to legal conclusions, we do not interpret Supreme Court authority as requiring counsel to have probed further in response to the "dilemma" of what to do with potential racial bias. Hagood expressed concern that other jurors

who might serve in place of Armstrong and Copeland were more troubling. The questionnaire answers could have been interpreted by counsel as not reflecting the kind of animosities to a black defendant that would motivate them to convict regardless of the evidence. Counsel also could have viewed further questioning of the potential jurors about their feelings on interracial relationships as likely to alienate jurors who would not be struck for cause. Counsel had experience with black defendants being found not guilty by all-white juries, and counsel's actions can be interpreted as mindful of the potential negative effect of further questioning jurors in Grayson County on their racial biases. It was not objectively unreasonable for the state *habeas* court to hold that defense counsel complied with *Strickland*.

Thomas is not entitled to *habeas* relief on the basis of the claim involving the jurors who expressed opposition to interracial marriage.

### B.   *Ineffective assistance in failing to challenge Thomas's competency to stand trial*

Thomas argues that his counsel was ineffective for failing to challenge his competency to stand trial, which was Claim 16 in his state *habeas* application. In June 2004, Thomas was declared incompetent to stand trial, a conclusion that no one challenged. Thomas was then sent to a psychiatric treatment facility at the Maximum Security Unit of North Texas State Hospital – Vernon Campus ("Vernon") for several weeks. While at Vernon, Thomas underwent a series of tests and examinations. Dr. Thomas Gray, a clinical psychologist, wrote in his medical report on July 23, 2004, that the test results "strongly indicated gross exaggeration of [Thomas's] symptoms." The report further provided that the "test results strongly indicate that he had been exaggerating any symptoms that he may be experiencing at present." The report concluded that Thomas was "diagnosed with malingering," meaning

22

that "[h]e has clearly exaggerated symptoms that he might be experiencing and may have even fabricated some symptoms of psychosis."

In its findings, the state *habeas* court recognized Dr. Gray's conclusion that Thomas was competent to stand trial. It also found that "Dr. [Edward] Gripon's testimony that the applicant was competent at the time of trial was credible." When Hagood was asked by the trial court after Thomas returned from the Vernon facility whether he was raising a second challenge to competency, Hagood answered that he was not "at that time." The state *habeas* court later found that defense counsel should have objected to the competency finding upon Thomas's return from Vernon, but it still found that Thomas "was competent to stand trial." The court's legal conclusion that we review is this: "The record does not support the applicant's claim that he was incompetent to stand trial or that his attorney was ineffective for failing to raise the competency issue a second time."

Thomas argues that trial counsel's failure to investigate his competency after he returned from Vernon was ineffective assistance of counsel. Further, the failure to investigate was prejudicial because there was a reasonable probability Thomas would have been found incompetent to stand trial if counsel had made a challenge at that time. "Counsel could have submitted evidence of their own interaction with" him or "have obtained a further expert competency evaluation."

It is clearly established law that an incompetent person cannot be put on trial. *See Drope v. Missouri*, 420 U.S. 162, 171 (1975). A defendant is not competent unless he has "a rational as well as factual understanding of the proceedings against him," and a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Indiana v. Edwards*, 554 U.S. 164, 170 (2008) (emphasis and citation omitted). A mentally ill defendant can still be competent to stand trial, however. *Mays v.*

*Stephens*, 757 F.3d 211, 216 (5th Cir. 2014).  If the defendant has a history of mental illness, defense counsel has a duty to investigate or request a hearing on competency.  *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990).  "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required." *Drope*, 420 U.S. at 180.  On collateral review, the question is whether, based on what was then known to the state trial court, "the failure to make further inquiry into [the defendant's] competence to stand trial[] denied [the defendant] a fair trial." *Id.* at 174–75.

To succeed on a claim that counsel failed to investigate, "a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial." *Miller*, 420 F.3d at 361. If defense counsel is aware of a fact that would cause a reasonable attorney to investigate further, then the failure to investigate further is likely deficient performance.  *See id.* at 364.  As we have already stated, there is a strong presumption under *Strickland* that defense counsel's strategic and tactical decisions fell "within the wide range of reasonable professional assistance." 466 U.S. at 689.  *Strickland* also prohibits this court from evaluating defense counsel's choices through the "distorting lens of hindsight." *Id.*

We examine the evidence on the attorney's actions.  Hagood admitted in his first affidavit that he "should have filed an objection to the competency report and should have urged a new competency hearing" after Thomas returned from Vernon.  His second affidavit, though, sought to justify his not seeking another hearing:

> [W]e did not request a new competency hearing.  The reason for this was simple: the applicant was not incompetent when we began his trial.  Although heavily medicated and still suffering from mental illness, I was able to talk to the applicant and discuss the case with him.  The applicant was able to participate in our

24

conversations and help me with his defense. In fact, based on some of our conversations and the applicant's ability to recall events and make suggestions, there was no question at that time that the applicant was competent to stand trial. The trial court specifically asked me if I was claiming incompetency. I avoided the question as much as I could, but eventually had to tell the judge that we were not challenging competency at that time because I had no new evidence to dispute the findings at Vernon or suggest the applicant was incompetent.

When Thomas returned from Vernon, the official report was that Thomas was severely manufacturing and exaggerating his psychotic symptoms. Based on that report, defense counsel may have understandably discounted signs in Thomas of potential incompetence. Thomas's erratic actions, in light of the medical evaluation, arguably did not place counsel on notice that further inquiry was needed. It is true that the state *habeas* court credited a portion of Hagood's first explanation — that he should have made a second competency objection. In deciding if this constituted an unreasonable factual finding, we accept that the state court could have treated the assertion in the first affidavit as Hagood's *post hoc* realization that he should have done more, while that in the second affidavit reflects Hagood's belief the challenge would not have been successful.

We acknowledge that a reasonable jurist could have concluded that defense counsel's dismissal of signs of incompetence and failure to challenge competency a second time was ineffective representation under *Strickland*. We must analyze the decision, though, by applying the standard of whether it was objectively unreasonable for the state *habeas* court to conclude that defense counsel complied with *Strickland*. In considering the facts known to defense counsel on the eve of trial, which are the facts the state *habeas* court considered, we cannot say that it was objectively unreasonable for the state court to conclude that defense counsel's representation complied with *Strickland*. Thomas is not entitled to *habeas* relief on this ground.

C.     *Ineffective assistance in rebutting the voluntary-intoxication theory*

Thomas argues that defense counsel's representation was inadequate because they failed to present "appropriate expert testimony to rebut th[e] central prosecution theory," which was that Thomas's undisputed psychosis at the time of the killings was self-induced.  In Texas, "[v]oluntary intoxication does not constitute a defense to the commission of crime."  TEX. PENAL CODE § 8.04(a).  Thomas contends that the cause of his psychosis "was the 'real fight' in the guilt phase," and counsel knew it.  The State and another doctor had both informed defense counsel that they should retain an expert who could testify about the effects of Thomas's recreational abuse of dextromethorphan ("DXM") contained in the cough suppressant Coricidin.  Instead, defense counsel called two of the State's experts and also a psychiatrist, though the latter was not qualified to testify as a pharmacologist.  Thomas reasons that his counsel's "failure to obtain appropriate expert testimony to rebut the prosecution's central theory was deficient" because it allowed the State to present an unchallenged factual predicate for its main argument.  Thomas's arguments regarding the ineffectiveness of his counsel in rebutting the voluntary-intoxication theory were presented as Claims 29, 30, and 31 in his state *habeas* application.

Thomas also contends that his counsel's performance was prejudicial because "[a]t least one reasonable juror could have decided in light of [other] witnesses' expert evaluations that Thomas's psychosis did not result from cough medicine or other substances, but from his severe organic mental illness."  Thomas further argues that the state court applied the wrong legal standard because it imposed a preponderance of the evidence standard while *Strickland* requires only a reasonable probability of a different outcome.

In an effort to demonstrate what further trial counsel could have done, Thomas in the state *habeas* proceedings submitted affidavits from three other

doctors. They supported Thomas's defense in these ways: Dr. Jonathan Lipman, an expert in neuropharmacology, would have testified that Thomas's psychosis was involuntary and not substance induced; Dr. Myla Young, an expert in neuropsychology, would have testified that Thomas's psychosis was the result of "significant brain dysfunction . . . like that demonstrated in several neurological, psychiatric and neurodevelopmental disorders"; Dr. Ruben Gur, also a neuropsychologist, would have testified that Thomas suffered from schizophrenia and that his psychosis was organic.

A defense attorney must reasonably investigate possible defenses or "make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. A decision not to investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* Again, to obtain *habeas* relief, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

A petitioner for *habeas* relief has the burden to support both that counsel was constitutionally ineffective and that prejudice resulted. *Rector v. Johnson*, 120 F.3d 551, 563 (5th Cir. 1997). The state *habeas* court here found insufficient proof "that counsel's performance was constitutionally deficient and [counsel] was not acting as a reasonably competent attorney, and his advice was not within the range of competence demanded of attorneys in criminal cases." As to prejudice, the court articulated the correct legal standard, that "a 'reasonable probability' the result would have been different is merely 'probability sufficient to undermine confidence in the outcome' of trial." The court then found that Thomas failed to prove that his counsel's performance "prejudiced his defense and that based on the opinions of Gur,

No. 17-70002

Young, and Lipman there is a reasonable probability that, but for counsels unprofessional errs the results of the proceeding would have been different."

To support his argument on this issue, Thomas largely relies on *Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005). Of course, only the Supreme Court's decisions constitute clearly established law under Section 2254(d)(1). Our review of *Draughon*, then, is to see whether it precedentially held what had already been clearly established by the Supreme Court. *See Marshall v. Rodgers*, 569 U.S. 58, 64 (2013). We held that *habeas* relief was warranted because defense counsel failed to present expert testimony challenging the main factual predicate of the prosecution's case. *Draughon*, 427 F.3d at 296. Draughon was charged with capital murder; he argued that the killing was accidental, thus making his intent to kill the primary issue at trial. *Id.* at 289–91. A witness testified that she saw the defendant pull a gun and shoot the victim. *Id.* at 290. The defense did not counter this testimony with any expert evidence about the trajectory of the bullet. *Id.* at 294. In *habeas* proceedings, a forensics expert testified that the defendant had not shot the victim directly, rather the bullet had ricocheted off the ground into the defendant. *Id.* at 291.

We take from *Draughon* that the clearly established law from the Supreme Court is that effective representation requires an attorney to conduct a reasonable investigation into the law and facts of the case. *Strickland*, 466 U.S. at 691. We applied that law in *Draughon* and held that on those facts, the defense counsel had to hire an expert witness to counter the main factual predicate of the state. In *Draughon*, if defense counsel did not put a forensics expert on the witness stand, then only the defendant could counter that testimony. 427 F.3d at 297. Thomas argues that his case is like *Draughon* because defense counsel failed to retain an expert witness to rebut the State's central theory that Thomas's psychosis was voluntarily induced from his ingestion of DXM in the Coricidin.

28

It is true that Hagood stated in his first affidavit that he "did not do an independent investigation of the experts." Whatever Hagood meant by that, he did offer a psychiatrist, Dr. Edward Gripon, who testified that Thomas's psychosis was organic. Dr. Gripon explained that he had reviewed thousands of pages of documentation on Thomas's mental condition; interviewed Thomas multiples times; and reviewed "offense reports, crime-scene photographs, witness statements, videotapes, audiotapes . . . jail records . . . medical records . . . treatment records . . . [and] expert reports." He testified that Thomas had a chronic schizophrenic condition and was insane at the time of the offenses. Dr. Gripon rejected that abusing DXM could have caused Thomas's actions.

In addition, defense counsel talked to two other medical experts who were ultimately not called to testify. As the state *habeas* court found, "Dr. Jay Crowder, a psychiatrist hired by the defense but not called at trial, informed the defense that he could not rule out the possibility that the psychotic episode leading up to the murders was induced by his use of a combination of drugs and alcohol." Hagood explained that he also had talked to Dr. Richard Rogers who "indicated that testing showed [Thomas] was manipulative and 'blew the top off' the questions indicating malingering."

Our concern is not whether counsel at trial could have done more. That is often, maybe always, the case. Thomas's counsel did introduce testimony to contradict the main factual predicate for the State's theory. Given that defense counsel presented testimony to counter the State's main factual predicate, no deficiency under *Draughon* exists.

Finally, Thomas also argues that his counsel provided ineffective representation on expert testimony when they "inexplicably resorted to calling the prosecution's experts." He further writes that "even if that strategy [was] reasonable . . . the resulting testimony confirms it was not." Such an argument fails. "It is all too tempting for a defendant to second-guess counsel's assistance

after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. Hagood explained that he hoped by calling the State's witnesses he could "diffuse some of the more damaging testimony against" Thomas. That trial counsel's strategy proved unsuccessful cannot be used as a reason to question the reasonableness of the strategy. *Id.*

Based on these facts, it was not objectively unreasonable for the state *habeas* court to conclude that Thomas had not carried his burden under *Strickland* to show defense counsel's representation was constitutionally inadequate. Thomas is not entitled to relief on this ground.

D.    *Ineffective assistance in presenting a mitigation defense*

Thomas argues that his trial counsel provided constitutionally deficient representation at sentencing, which prejudiced him because there was a substantial probability that a reasonable juror would have reached a different outcome if the mitigation defense had been adequate. This argument was presented as Claim 34 to the state *habeas* court. As we have already stated, Thomas must show that the state court's application of the *Strickland* standard was objectively unreasonable to his claim of ineffective assistance of counsel at sentencing, a substantially higher burden.

First, Thomas contends that his trial counsel's investigation of mitigating evidence was deficient, which prevented the jury from hearing the tragic story of his life. The story of his life, he asserts, was filled with "mental-health issues, abuse, and neglect." Those problems were compounded with alcohol and drug abuse. He writes that he attempted suicide at a young age with no objection from his parents; tragically, his parents encouraged it. He argues that these facts were well known to his friends and family, that defense

30

counsel was deficient by failing both to investigate this personal history and to present evidence of it to jurors.

Next, Thomas argues that "there is at least a reasonable probability that one juror would have decided against the death penalty," and thus trial counsel's deficient performance was prejudicial to him. More importantly, he argues that "the state *habeas* court's conclusion that [he] failed to prove prejudice unreasonably applied clearly established law." He contends that "the state court completely ignored what [the other] witnesses would have said and how their testimony would have altered the picture before the jury at sentencing." Ultimately, Thomas asserts that defense counsel's representation at sentencing "painted an overwhelmingly incomplete and misleading picture."

The question before this court is whether it was objectively unreasonable for the state *habeas* court to conclude that defense counsel's representation at sentencing complied with *Strickland.* If reasonable jurists could disagree about the reasonableness of the state court's decision, then AEDPA precludes federal *habeas* relief because "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102. AEDPA requires deference to the state court's decision if there is a reasonable basis for it. *Id.*

A defense attorney's obligations in a capital case include conducting a thorough investigation into potential mitigating evidence. *See Wiggins v. Smith*, 539 U.S. 510, 522 (2003). In citing to the ABA guidelines for performance of defense counsel in death-penalty cases, the Supreme Court stated that counsel should investigate and consider presenting testimony about the defendant's medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences. *Id.* at 524. "[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance

something will turn up." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). At the same time, defense counsel must begin preparation for sentencing with adequate time for investigation into the defendant's background. *Williams v. Taylor*, 529 U.S. 362, 395 (2000).

We have examined the principal evidence on counsel's performance that was presented to the state *habeas* court. The affidavits from each of the trial counsel discuss the mitigation case. Some of the information in the affidavits raises doubts about the preparation of a case for mitigation of sentence. Hagood's first affidavit states he met only twice on his own with Shelli Schade, the person he hired as an expert to prepare the mitigation case, whom the record shows was recommended to Hagood by the Texas Defender Service. That recommendation gives at least initial reasonableness to Hagood's reliance that Schade knew what to do and would do it. He was "disappointed with the work" she did and said it could have been either his or co-counsel's fault for not "giving her enough direction." Hagood's first affidavit indicated some involvement in the decisions being made, such as rejecting Schade's suggestion to seek testimony from two particular family members because Hagood did not think they would be worth the effort. He was interested in having Thomas's mother testify, but "shortly before trial she disappeared."

Hagood's second affidavit describes much more thorough preparation. That affidavit discusses such matters as the witnesses he considered, efforts he made to prepare useful ones to testify, and judgments he made at trial regarding the value of their testimony:

> The applicant claims that we were not prepared to present our punishment case. This is patently false. Ms. Peterson and I spent many months preparing all aspects of the case. I had talked to several family members regarding the applicant's background and childhood.
> The applicant's mother was angry at the applicant for killing her grandson. Although I could have gleaned useful background

information from her testimony, I did not do so. She had left the state and I made no attempt to subpoena her or get her back to Grayson County, Texas for the trial. I was too afraid of what might come out of her mouth and further damage she might [do] to the applicant. I had no intention of putting her on the stand and preferred that the State not have that opportunity either.

I believed the applicant's aunt, Doris Gonzales, would be my primary witness regarding mitigation. When I interviewed her she was articulate and passionate about the trial and obstacles faced by the applicant. Once on the stand, however, she collapsed. She was unable to relate to the jury, despite my best attempts, in as clear and convincing a manner as she had during trial preparation.

I had also prepared two of the applicant's brothers and his father. They, too, had done a much better job in my office than they were able to in court. Once I realized that they were not coming across well, I abandoned my questioning of those three witnesses.

On appeal here, Thomas emphasizes counsel Peterson's statement in her first affidavit that "[l]ate in the trial, Mr. Hagood asked me who we had for the punishment phase . . . [which was when she] realized that [they] were not prepared for the punishment phase." Peterson's second affidavit gave what could be seen as a more comprehensive explanation. She restated her earlier assertions, and described her understanding of what Shelli Schade was supposed to be doing:

I did not think Mr. Hagood had spoken to any witnesses, I was not privy to any witness he may have talked to or the reasons behind much of Mr. Hagood's strategy at trial.

The applicant's mother was not cooperative. I procured Kate Allen with Mr. Hagood's consent.

I do not know what instructions Ms. Schade was given by Mr. Hagood. All materials possessed by Mr. Hagood and myself were available to Ms. Schade. Ms. Schade requested more documents from me as the trial went on and I provided everything possible.

Since the state *habeas* court decision is what we must review, we quote some of its factual findings on this issue. It largely accepted the assertions

Hagood made in his second affidavit that we have already quoted. Importantly, it found that "Hagood spent many months preparing all aspects of the case. He stated that he had talked to several family members regarding the applicant's background and childhood." It further found that Hagood believed Thomas's aunt would be the defense's principal mitigation witness but abandoned questioning her because she collapsed on the stand and "was unable to relate to the jury." The state court similarly found that Hagood abandoned questioning of Thomas's father and brothers when "he realized that they were not coming across well." Further, the state court found that "Hagood was aware of the family background and history of mental problems and alcohol abuse," and he "felt that such information to a juror could cut both ways."

Other factual findings reflect an acknowledgement by the state court that counsel had not done all that could have been done. For example, the court found that counsel "did not initially retain any experts for the mitigation phase of the case." "Members of Mr. Thomas's family, friends and community leaders were available at the time of Mr. Thomas's trial to inform counsel, experts, and jurors about Mr. Thomas's life. The defense team did not contact all of Mr. Thomas' family members. Nor did Ms. Schade draft a social history or mitigation report."

We must defer to these factual findings, which are presumed correct, unless rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Thomas asserts it was unreasonable for the state court to find that Hagood spent months preparing because some of Hagood's claims, such as speaking with Thomas's family members, were "demonstrably untrue" based on later evidence that was gathered. As we have stated regarding other claims, though, Thomas must convince that the state court made "an unreasonable determination of the facts" by considering "the evidence presented in the State

court proceeding." § 2254(d)(2). The record we can consider is only the one before the state court.

Moreover, it is not only the sentencing-phase evidence that is relevant to mitigation. As the federal district court pointed out, Hagood had already presented substantial mitigating evidence during the guilt phase of the trial; offering the evidence at the sentencing phase would have been cumulative. For example, Thomas's father, Danny Thomas, testified about Thomas's upbringing and childhood. He testified that Thomas had appeared to have "mental problems," describing nervous-breakdown behavior and depression.

Also testifying at the guilt phase was Carmen Hayes, Thomas's girlfriend at the time of the murders. She testified that Thomas spoke often about the book of Revelation and believed that "all women were Jezebels," meaning that "women were lustful." She also testified that two days before the murders, Thomas said, "God, forgive me for my sins," before stabbing himself in the chest, and saying he wanted to "fly with the angels." He would also put duct tape over his mouth because "he felt like he was the devil and if he stopped talking for 24 hours, the world would be right." Hayes, along with Paul Boren, Amy Ingle, and Rose Soto Caballero, testified to Thomas's frequent use of the term "déjà vu." Hayes testified that Thomas believed that "God was making him relive days because he was smoking marijuana [as p]unishment."

Isaiah Gibbs, Thomas's lifelong friend, testified about Thomas's relationship with his mother, Rochelle Thomas. Ms. Thomas regularly took her son and Gibbs to church. When Gibbs and Thomas were with "some girl" she did not like, Ms. Thomas referred to her as "Jezebel." Gibbs spoke to the strong influence that she had on Thomas, and how she would give whippings with belts or shoes to Gibbs and Thomas.

Ingle, Hayes, Bryant Hughes, Boren, and Rae Baird each testified about Thomas's religious obsessions. Ingle testified that he cut out the words in

Revelation to reword it.  Hughes testified that Thomas believed the angels were "bound in hell" and that Thomas wanted to free them.  Boren relayed a story about Thomas's claiming that "if everyone would just stop and say, peace, love, that would bring about the end of world."

The State also called Eric Ross, Thomas's older brother, at the sentencing stage.  That brother testified to Thomas's childhood and stated that he loved his brother.  When Thomas finally began presenting mitigating evidence at the sentencing phase, substantial background information and mitigating evidence had already been presented to the jury.

The defense called nine additional witnesses for further mitigation. Included was Danny Ross, Thomas's brother, who testified about Thomas's childhood and how he strove for knowledge as a young student.  Ross's wife Wendy Ross also testified that she loved Thomas and that he had been there for her.  She testified that Thomas had watched her children for her and that she never had any fears or concerns about Thomas's watching her children, but that his behavior changed in the months leading up to the murders.  Thomas's aunt Doris Gonzales also testified, describing her visits with Thomas and his brothers as full of "[l]aughter, happiness, joking, [and] kidding."

Dr. Kate Allen, a clinical social worker and family sociologist, also testified for Thomas.  In her opinion, Thomas was essentially raised by himself and his two brothers, suffered from schizophrenia, and had traits of a borderline personality disorder and antisocial personality disorder.  She further testified that her opinion was that "his mental illness was, by far, the driving force" of the murders.

The defense had presented much mitigation evidence at the guilt phase, then supplemented that evidence at sentencing.  The state *habeas* court's conclusion that defense counsel complied with *Strickland* was not objectively unreasonable.

No. 17-70002

Thomas's case is distinguishable from the cases he cites.  For example, he refers us to *Porter v. McCollum*, 558 U.S. 30 (2009), to argue that ignoring pertinent paths of investigation was deficient performance under *Strickland*. In *Porter*, however, defense counsel failed to "obtain *any* of [the defendant's] school, medical, or military service records or interview *any* members of [the defendant's] family." *Id.* at 39 (emphasis added).  Here, the state court found that Hagood had spent months preparing and had interviewed various members of the family.  Thus, unlike the defense attorney in *Porter* whose failure to investigate prevented him from making a strategic choice about what to tell the jury, Hagood's investigation into Thomas's past allowed him to make a strategic choice.  In his brief on appeal, Thomas writes that because of defense counsel's ineffectiveness "the jury never heard . . . that [he] badly needed medical help from a young age and never received it — a very different portrait of his humanity and culpability."  To the extent the jury did not hear this story, it was arguably because Thomas's counsel made a strategic decision not to share this story for fear that it would hurt Thomas's case.  Even if that decision was incorrect and against clearly established law requiring more of defense counsel, it was not objectively unreasonable for the state court to conclude that defense counsel complied with *Strickland*. *See Miller*, 420 F.3d at 360.  Thomas is not entitled to *habeas* relief on this claim.

We view the current arguments about the effectiveness of counsel's preparation of a mitigation case primarily to present factual questions.  The state *habeas* court had to make credibility choices, considering all the evidence before it.  Though some of the information in these affidavits makes the preparation of a case on mitigation appear worrisomely slapdash, Hagood's second affidavit shows meaningful effort, with some mistakes and surprises, but not constitutionally ineffective performance.  We cannot conclude that the

37

state *habeas* court made an unreasonable determination of the facts when it accepted the assertions that it did.

We conclude that Thomas has not overcome the state *habeas* court's factual finding that counsel was aware of Thomas's extensively troubled past. Hagood asserts he was making choices about which witnesses to put on the stand, and the state *habeas* court found those choices did not make Hagood ineffective.

AFFIRMED.

No. 17-70002

STEPHEN A. HIGGINSON, Circuit Judge, concurring in part and dissenting in part:

An all-white jury found Thomas, a black man, guilty of capital murder and sentenced him to death for killing his wife, a white woman, and two children, including their interracial child. That jury included three jurors who acknowledged bias against interracial marriage. Empaneling them—affirming their capital verdict and death sentence—was objectively unreasonable, contradicting the clearly established Supreme Court and Fifth Circuit caselaw aptly summarized in the majority opinion[1]:

> It is undeniable "that discrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice.'" [*Pena-Rodriguez*, 137 S. Ct. 855,] 868 [(2017)] (quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)). Any "defendant has the right to an impartial jury that can view him without racial animus, which so long has distorted our system of criminal justice." *Georgia v. McCollum*, 505 U.S. 42, 58 (1992). If a defendant is denied the right to an impartial decisionmaker, regardless of the nature of the bias, any subsequent conviction is tainted with constitutional infirmity. *Virgil* [*v. Dretke*], 446 F.3d [598,] 607 [(5th Cir. 2006)]. Any juror who "the defendant has specific reason to believe would be incapable of confronting and suppressing their racism" should be removed from the jury. *See McCollum*, 505 U.S. at 58. If a juror should have been removed for cause, then seating that juror requires reversal. *United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000).

---

[1] I appreciatively concur in the majority opinion's resolution of Thomas's other COA issues except for whether his counsel was ineffective in addressing jury bias. As to that issue, because I see AEDPA error under *Irvin v. Dowd*, 366 U.S. 717, 722 (1961), and *Parker v. Gladden*, 385 U.S. 363, 366 (1966) (a defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors"), denying Thomas his Sixth Amendment right to an impartial jury, above all a jury without overt racial bias, *Pena-Rodriguez*, 137 S. Ct. 855, 868 (2017); *see also United States v Booker*, 480 F.2d 1310, 1311 (7th Cir. 1973) ("if even one member of the jury harbors racial prejudice against the accused, his right to trial by an impartial jury is impaired"), I do not reach whether Thomas's trial counsel, who undertook either no or negligible voir dire inquiry into jurors' avowals of actual racial bias, was constitutionally deficient under *Turner v. Murray*, 476 U.S. 28, 36–37 (1986), and *Mu'Min v. Virginia*, 500 U.S. 415, 431–32 (1991).

No. 17-70002

The facts of Thomas's violent crime are undisputed and the majority recognizes that racial issues were inextricably bound up with his murders. *See Rosales-Lopez v. United States*, 451 U.S. 182, 189–90 (1981). Indeed, the fact of Thomas's interracial relationship with his victim was at the crux of the State's case, urging the all-white jury to vote for capital punishment:

> Are you going to take the risk about him asking your daughter out, or your granddaughter out? After watching the string of girls that came up here and apparently could talk him into—that he could talk into being with him, are you going to take that chance?

Adjudicating this horrific crime would challenge any juror, but it is constitutionally prohibited for a racially biased juror who "vigorously oppose[s]" (Juror Ulmer) (or "oppose[s]"—Jurors Copeland and Armstrong) "people of different racial backgrounds marrying and/or having children."

As we both celebrate and enforce, the Constitution rests our "criminal justice system . . . firmly on the proposition that before a person's liberty can be deprived, guilt must be found, beyond a reasonable doubt, by an impartial decisionmaker. The Sixth Amendment provides in part: 'In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an *impartial jury* of the State and district wherein the crime shall have been committed.' Put simply, 'The right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors.'" *Virgil v. Dretke*, 446 F.3d 598, 605 & nn. 22, 23 (5th Cir. 2006) (quoting the Sixth Amendment and clearly established Supreme Court caselaw, including *Irvin v. Dowd*, 366 U.S. 717, 722 (1961), and *Parker v. Gladden*, 385 U.S. 363, 366 (1966) (per curiam)) (alterations in original).

In Thomas's state habeas proceeding, the state court's cursory conclusion about juror bias was that "[t]here is no evidence that the jury's decision was

racially motivated." I agree with the majority that this finding gave no resolution to Thomas's structural error claim that jurors with actual, disqualifying bias were seated.  Where I disagree is with the majority's compensating inference that Ulmer's admitted-to racial bias was impliedly disclaimed by him as a "moral judgment" he "could set aside…in determining guilt."  Although Ulmer separately stated that he would not let the color of Thomas's skin affect his judgment of him, the majority candidly acknowledges that he never retreated from his "beliefs about interracial marriage."  "Belief" is dignifying here.  Ulmer admitted to racial animus—condemned by the unanimous Supreme Court one half century ago in *Loving v. Virginia* as "odious," "invidious" and "repugnant"—here against the *exact* interracial circumstance of the offense Thomas was sentenced to death for. 388 U.S. 1, 11 & n.11 (1967).

I would apply clearly established Supreme Court law to forbid persons from being privileged to participate in the judicial process to make life or death judgment about brutal murders involving interracial marriage and offspring those jurors openly confirm they have racial bias against.  The law rightly condemned this repugnancy when enacted as law by lawmakers, just as it must condemn it when we ask citizens to join us as judges.