# SUPREME COURT OF THE UNITED STATES

## ANDRE LEE THOMAS *v.* BOBBY LUMPKIN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 21–444.   Decided October 11, 2022

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting from the denial of certiorari.

Petitioner Andre Thomas was sentenced to death for the murder of his estranged wife, their son, and her daughter from a previous relationship. Thomas is Black, his wife was white, and their son was biracial. Thomas was convicted and sentenced to death by an all-white jury, three of whom expressed firm opposition to interracial marriage and procreation in their written juror questionnaires. Among other reasons, these jurors opined that such relationships were against God's will and that people "should stay with [their] Blood Line." App. to Pet. for Cert. 395a. Despite their declarations of bias, Thomas' counsel not only failed to exercise peremptory strikes on these individuals or move to strike them for cause, but failed even to question two of the three jurors about their stated bias and whether it could affect their deliberations. Without objection from Thomas' counsel or the State's attorney, the three jurors were seated. Together with nine other white jurors, they convicted and sentenced Thomas to death.

Thomas' conviction and death sentence clearly violate the constitutional right to the effective assistance of counsel.

The contrary judgment of the Fifth Circuit should be summarily reversed.

## I

### A

Thomas was charged with capital murder in 2005 for the killing of his estranged wife, their child, and his wife's child from a previous relationship. The facts of Thomas' offense were gruesome: Thomas attempted to remove the victims' hearts because he believed that would "set them free from evil." See 995 F. 3d 432, 438 (CA5 2021) (internal quotation marks omitted). Thomas also stabbed himself during the course of his offense; later that day, he turned himself in and confessed. *Id.,* at 438–439. While Thomas was incarcerated awaiting trial, he removed one of his own eyeballs; years later, he removed the other one. *Id.,* at 439. Thomas pleaded not guilty by reason of insanity, and while the State agreed that Thomas was psychotic at the time of his offense, it prevailed in arguing that "his psychosis was voluntarily induced just before the killings through ingestion of . . . cough medicine." *Ibid.*

Because of the interracial nature of Thomas' offense, his counsel[1] and the State questioned prospective jurors about their attitudes toward interracial marriage and procreation. Prospective jurors were required to answer a written questionnaire that asked:

> "105. The Defendant in this case, Andre Thomas, and his ex-wife, Laura Boren Thomas, are of different racial backgrounds. Which of the following best reflects your feelings or opinions about people of different racial backgrounds marrying and/or having children:
>
>     (__) I vigorously oppose people of different racial

---

[1] At trial, Thomas was represented by two attorneys: a lead counsel and a second chair. References to counsel are in the singular, except where noted, because only one attorney conducted *voir dire* at a time.

backgrounds marrying and/or having children and am not afraid to say so.

(__) I oppose people of different racial backgrounds marrying and/or having children, but I try to keep my feelings to myself.

(__) I do not oppose people of different racial backgrounds marrying or being together, but I do oppose them having children.

(__) I think people should be able to marry or be with anyone they wish.

PLEASE TELL US WHY YOU FEEL THIS WAY: [blank provided]." App. to Pet. for Cert. 391a–392a (boldface deleted).

At issue in this case are the responses of three white jurors.

First, juror number four indicated that he "vigorously oppose[d]" interracial marriage and that he was "not afraid to say so." *Id.*, at 392a. In the additional space provided, he wrote: "I don't believe God intended for this." *Ibid.*

During individual *voir dire*, defense counsel engaged in the following colloquy with this juror:

"[Q.] Well, how would—how do you feel about, if you are sitting on a case where the defendant or a defendant accused of capital murder was a black male, and the victim, his wife, was a white female.

[A.] Well, I think—I think it's wrong to have those relationships, my view, but we are all human beings and God made every one of us. And, you know, as far as— I don't care if it is white/white, black/black, that don't matter to me. If you've done it, you are a human being, you have got to own up to your responsibility.

[Q.] So, the color of anyone's skin would not have any impact or bearing upon your deliberations?

[A.] No, not according to that, no.

[Q.] Okay.

[A.] Not whether they were guilty or innocent.

> [Q.] Would the race of either the defendant or the vic-
> tim be something that you would take into considera-
> tion in determining, or considering, answering these
> special issues, or considering either the death penalty
> or life imprisonment?
> [A.] No, I wouldn't judge a man for murder or some-
> thing like that according to something like that, no, I
> would not." *Thomas* v. *Director*, No. 4:09–CV–644 (ED
> Tex., Sept. 19, 2016), App. to Pet. for Cert. 115a–116a,
> 2016 WL 4988257, *23.

Juror number four also expressed the view that appeals in death penalty cases should be eliminated or restricted, and that the death penalty was not applied in enough cases, Record 1099, though he did state during *voir dire* that the death penalty should not be imposed when a defendant is insane, 16 Reporter's Record 53 (Tex. Crim. App.).[2]  Although Thomas' counsel had peremptory strikes available, counsel neither exercised one on this juror nor otherwise objected to him being seated.

Second, juror number five responded by indicating that she opposed interracial marriage and tried to keep those feelings to herself.  She explained in the additional space: "I think it is harmful for the children involved because they do not have a specific race to belong to."  App. to Pet. for Cert. 394a.  During the individual *voir dire* of juror number five, neither defense counsel nor the State asked any questions about race or interracial marriage.  Nor did either

---

[2] This remark on the insanity defense is one of only very few remarks offered by the three jurors at issue that might have seemed favorable to the defense.  Somewhat similarly, juror number five recounted a news report that Thomas had committed his crime "because he was insane," Record 1051, and juror six expressed admiration in her questionnaire for one of Thomas' attorneys.  *Id*. at 1070.  These passing comments cannot excuse defense counsel's failure to take the steps necessary to address the serious impartiality concerns raised by these jurors' remarks on interracial marriage.

party inquire as to whether the juror's views on those topics could affect her deliberations or her decision whether to impose the death penalty. Again, although defense counsel had peremptory strikes available, counsel did not exercise one or seek to strike juror number five for cause.

Third, juror number six responded to the written questionnaire by reporting that he agreed that interracial marriage "[s]hould not [b]e," explaining: "I think we should stay with our Blood Line." *Id.*, at 395a. Juror number six also agreed that he opposed interracial marriage but that he tried to keep those feelings to himself. During juror number six's individual *voir dire*, the juror explained that state and federal criminal laws "are too lenient" and that "the judges' and everybody's hands are tied" with "the laws we have on the books." Record 1130. Neither defense counsel nor the State asked juror number six about his views on interracial marriage or biracial children, his views on race generally, or whether those views could have an impact on his deliberations at the guilt and penalty phases. Defense counsel once again had peremptory challenges available but did not use them or request that the court strike the juror for cause.

All three jurors were seated on the all-white jury. A fourth juror was seated as an alternate juror. She affirmed that she "oppose[d] people of different racial backgrounds marrying and/or having children," and added: "As I stated before I try not to judge what other people do. I oppose gay marriage but a man and woman have the right to choose." App. to Pet. for Cert. 397a–398a. During the alternate juror's *voir dire*, neither Thomas' counsel nor the State followed up about these answers, nor did counsel exercise any available peremptory strikes or move to strike the juror for cause. The juror was seated as the first alternate. Defense council concluded *voir dire* with unused peremptory challenges.

After the trial concluded, the court excused the alternate jurors. The remaining jurors ultimately convicted Thomas.

During the penalty phase, the State asked the jury to consider the risk that Thomas could pose to the community if he was not executed: "Are you going to take the risk about [Thomas] asking your daughter out, or your granddaughter out?" 995 F. 3d, at 443. The State then referenced five guilt-phase witnesses who had testified about their romantic relationships with Thomas, including one woman who became pregnant by Thomas. The State reminded the jury about "the string of girls that came up here and apparently . . . that he could talk [him] into being with him, are you going to take that chance?" *Ibid*. The jury sentenced Thomas to death.

### B

Thomas filed a direct appeal of his conviction and sentence. While that appeal was pending, he filed an application for a writ of habeas corpus in Texas state court raising two arguments related to juror bias. First, he argued that his trial counsel was ineffective by failing to question or strike the biased jurors. Second, he claimed that seating jurors opposed to interracial marriage violated his Sixth and Fourteenth Amendment rights to trial by an impartial jury.

In support of his ineffective-assistance-of-counsel argument, Thomas' lead trial counsel filed an affidavit declaring that his failure to question jurors opposed to interracial marriage "was not intentional; [he] simply didn't do it." Record 327. Second-chair counsel explained that Thomas' case was her first capital trial, that she was "new at capital voir dire," and that "[v]oir dire in this case was a nightmare." *Id.*, at 422–423. In response, the State attached two new affidavits from the same two attorneys. Lead counsel explained that he "would never ask pointed questions regarding racial bias from a juror without a real basis to do so" because that might alienate a juror. *Id.*, at 1748.

Second-chair counsel gave substantively the same explanation. *Id.*, at 1764. Using identical language, both declared that "[f]or those jurors who expressed some problem with interracial relationships, either [co-counsel] or I questioned them to the extent necessary for us to request a strike for cause or make a decision to use a strike against them." *Id.*, at 1748, 1764–1765.

The state habeas court declined to hold an evidentiary hearing. It denied Thomas' impartial-jury argument on the merits because the state court saw "no evidence that the jury's decision was racially motivated." App. to Pet. for Cert. 329a. The court dismissed Thomas' ineffective-assistance claim because Thomas "failed to overcome the presumption that trial counsel was effective during voir dire questioning." *Id.,* at 373a. The Court of Criminal Appeals of Texas adopted the lower court's findings of fact and conclusions of law. *Id.*, at 292a.

Thomas then filed a federal habeas petition raising the same juror-bias and ineffective-assistance claims. The District Court denied the petition, deeming the juror-bias claim "speculative," and finding that defense counsel's "decision to forego questioning three of the four jurors about racial bias was simply a matter of trial strategy." *Id.*, at 121a, 125a. In a divided opinion, the Fifth Circuit affirmed. The panel agreed that the state habeas court's finding that there was "'no evidence that the jury's decision was racially motivated'" was "not directly on point as to whether any juror with a relevant bias that made him or her unable to be impartial was seated on the jury." 995 F. 3d, at 444. Nevertheless, the majority concluded that the state court made a "necessary implicit finding . . . that no juror would base his decision on race rather than the evidence presented." *Ibid*.

With respect to Thomas' ineffective-assistance claim, the panel determined that the state habeas court was not ob-

jectively unreasonable in finding trial counsel not ineffective, explaining that counsel's failure to probe juror number five's and juror number six's oppositions to interracial marriage or procreation likely was a tactical decision. *Id.,* at 450.

Judge Higginson dissented. He saw no evidence that juror number four retreated from his vigorous opposition to interracial marriage. He pointed out that juror number four had admitted to "racial animus" involving the "exact interracial circumstances of the offense" for which Thomas was sentenced to death. *Id.,* at 461 (emphasis deleted). In Judge Higginson's view, "clearly established Supreme Court law . . . forbid[s] persons from being privileged to participate in the judicial process to make life or death judgment about brutal murders involving interracial marriage and offspring those jurors openly confirm they have racial bias against." *Ibid.* Because Judge Higginson would have reversed on the basis of Thomas' juror bias claim, he did not reach the question whether Thomas' counsel rendered deficient performance.

Thomas now petitions this Court for a writ of certiorari.

## II

Thomas' trial counsel failed to object or to exercise available peremptory strikes for three jurors who expressed personal hostility to interracial marriage and procreation. Additionally, counsel entirely failed to inquire into the race-based views two of the jurors had expressed in their written questionnaire and the potential impact those views could have on their verdict and during the penalty phase. As a result, Thomas was convicted and sentenced to death by a jury that included three jurors who expressed bias against him.

The Sixth Amendment right to counsel includes "'the right to the effective assistance of counsel.'" *Strickland* v. *Washington*, 466 U. S. 668, 686 (1984) (quoting *McMann* v.

*Richardson*, 397 U. S. 759, 771, n. 14 (1970)). *Strickland* requires a defendant who claims ineffective assistance of counsel to prove (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) that any deficiency was "prejudicial to the defense." 466 U. S., at 688, 692. Thomas has met both requirements.[3]

Thomas' counsel fell far below an objective standard of reasonableness. In a written questionnaire, four prospective jurors admitted that they either "oppose[d]" or "vigorously oppose[d]" interracial marriage and procreation. Yet counsel questioned only one of them (the third juror) about their views on race, and as Judge Higginson recognized in dissent below, that juror "never retreated from his 'beliefs about interracial marriage.'" 995 F. 3d, at 461.

Counsel asked no questions at all about race of the other three prospective jurors, each of whom had also expressed opposition to interracial marriage. This Court has recognized that specific questioning may be required where there is a "constitutionally significant likelihood that, absent questioning about racial prejudice," the State would not impanel an impartial jury. *Ristaino* v. *Ross*, 424 U. S. 589, 596 (1976). In *Turner* v. *Murray*, 476 U. S. 28 (1986), the Court specifically held that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." *Id.,* at 36–37. The Court based that decision in part on the broad discretion, and resulting potential for prejudice, given to a jury during the prejudice phase of a capital trial. *Id.,* at 35 (plurality opinion). The Court held, nevertheless, that the trial judge's "failure to question

————————

[3] Thomas also raised a fair trial claim under the Sixth Amendment. The State argues that Thomas has procedurally defaulted this claim because trial counsel did not strike the jurors or object to their seating. Thomas disagrees. I do not address the fair trial claim, however, because Thomas is entitled to relief on his ineffective-assistance-of-counsel claim, which all agree is properly before this Court.

the venire on racial prejudice" is not by itself erroneous unless the "defendant has specifically requested such an inquiry," effectively putting the burden on defendants' attorneys to protect this right. *Id.,* at 37.

There is no doubt that the facts of this case make out the "constitutionally significant likelihood" under which specific questioning is required. This is a capital case involving interracial violence where three seated jurors and an alternate expressed prejudicial views. Had defense counsel requested individual *voir dire* of the three prospective jurors, it would have been reversible error for the trial judge to deny that request. See *id.*, at 36 (plurality opinion); *id.,* at 36–37 (majority opinion). Counsel's failure to do so was constitutionally ineffective.

The state habeas court's unexplained contrary conclusion was objectively unreasonable. Although the challenged jurors gave general affirmations when the trial judge asked if they would "make up [their] mind based on the evidence," see, *e.g.*, App. to Pet. for Cert. 116a, those answers to general questioning do not absolve defense counsel of failing to question the jurors about racial bias and its potential impact on the verdict and penalty phase deliberations. As this Court has long explained, when a juror "admit[s] prejudice," general statements of impartiality "can be given little weight." *Irvin* v. *Dowd*, 366 U. S. 717, 728 (1961); see also *Ham* v. *South Carolina*, 409 U. S. 524, 526 (1973) ("three general questions as to bias, prejudice, or partiality" were insufficient where trial judge refused to examine jurors about racial prejudice).

Moreover, while trial counsel has wide latitude to make strategic decisions during *voir dire*, there was no excuse in this case for their failure to ask the three other jurors questions similar to those that counsel asked juror number four. Trial counsel initially admitted as much, swearing in affidavits that counsel's failure to probe the jurors' views "was not intentional" before subsequently attesting that counsel

"questioned [the jurors who expressed opposition to inter-racial marriage] to the extent necessary." Trial counsel's unusual, subsequently filed affidavits on behalf of the State are contradicted by the record: Trial counsel claims to have questioned the potential jurors who declared opposition to interracial marriage, but the record shows that counsel did not ask any questions at all related to interracial marriage of three of the four who expressed opposition. That alone demonstrates ineffectiveness. There are numerous ways to broach sensitive but necessary subjects during *voir dire* without invoking the ire of jurors.[4]

It is no doubt true that there may sometimes be strategic reasons not to examine jurors for racial bias, but counsel cited none here. To the contrary, the hostility the jurors expressed in their questionnaires strongly suggested that their presence would infect the proceedings with racial bias. Counsel's subsequent affidavits therefore "resembl[e] more a *post hoc* rationalization of counsel's conduct than an accurate description of their" strategic decisions during *voir dire. Wiggins* v. *Smith*, 539 U. S. 510, 526–527 (2003).

Because the Court of Appeals erred at the first *Strickland* prong, it did not reach the second. It is plain, however, that the state habeas court's perfunctory conclusion that "[peti-tioner] has not demonstrated that any alleged error preju-diced [the] defense," App. to Pet. for Cert. 373a, violated clearly established law. As we have often recognized, seat-ing even one biased juror infringes on a criminal defend-ant's Sixth Amendment right. See *Parker* v. *Gladden*, 385

———————

[4] For instance, defense counsel could have posed something like the following question: "Thank you for your honest response to the question about your feelings toward interracial marriage. Many people have strong feelings on the matter. For some people it can be hard to put those feelings aside in judging evidence for a verdict, or especially in determin-ing an appropriate punishment. Is there any possibility that your per-sonal feelings about interracial marriage could influence you in this case in any way? If there is, although you may be the perfect juror for many other cases, you may not be a great fit for this case."

U. S. 363, 366 (1966) (*per curiam*) (a defendant is "entitled
to be tried by 12, not 9 or even 10, impartial and unpreju-
diced jurors"); *United States* v. *Martinez-Salazar*, 528 U. S.
304, 316 (2000) ("[T]he seating of any juror who should have
been dismissed for cause . . . would require reversal").
These concerns are even greater in capital cases involving
interracial violence.  See *Turner*, 476 U. S., at 37.[5]  As the
Fifth Circuit has held, these (and other) precedents clearly
establish that a defendant suffers prejudice when trial
counsel fails to challenge biased jurors.  See *Virgil* v. *Dretke*,
446 F. 3d 598, 613–614 (2006).

Thomas' offense involved not only interracial violence,
but also interracial intimacy.  Historians have long recog-
nized that interracial marriage, sex, and procreation evoke
some of the most invidious forms of prejudice and violence.
"No other way of crossing the color line is so attended by the
emotion commonly associated with violating a social taboo
as intermarriage and extra-marital relations between a
Negro man and a white woman."  2 G. Myrdal, An American
Dilemma 606 (2009).  Far from avoiding these incendiary
topics, the State fanned the flames in urging the jury to sen-
tence Thomas to death.  The prosecutor asked the jury

--------

[5] The Court specifically observed in *Turner* that a racially biased juror
might be more likely to find aggravating factors and less favorably in-
clined toward mitigation evidence, particularly in a case involving inter-
racial violence.  476 U. S., at 35 (plurality opinion).  Subsequent social
science literature has underscored that concern.  See generally M. Lynch
& C. Haney, Mapping the Racial Bias of the White Male Capital Juror:
Jury Composition and the "Empathic Divide," 45 Law & Soc. Rev. 69
(2011).  The concern is as applicable here as it was in *Turner*: Much as
Turner argued "mental disturbance as a mitigating circumstance" at the
penalty phase, 476 U. S., at 35, Thomas' counsel argued that Thomas
suffered acute psychosis from a lifelong mental illness, see 995 F. 3d 432,
439 (CA5 2021).

Social science evidence also confirms *Turner*'s teachings regarding the
importance of questioning jurors about potential racial bias.  See, *e.g.,* P.
Joy, Race Matters in Jury Selection, 109 Nw. U. L. Rev. Online 180, 181–
183 (2015) (summarizing studies).

whether they were "going to take the risk about [Thomas] asking your daughter out, or your granddaughter out?" and reminded the jury during the penalty phase about the "string of girls" who had testified during the guilt phase about their romantic relationship with Thomas. 995 F. 3d, at 443.[6]

By failing to challenge, or even question, jurors who were hostile to interracial marriage in a capital case involving that explosive topic, Thomas' counsel performed well below an objective standard of reasonableness. This deficient performance prejudiced Thomas by depriving him of a fair trial. The state court's contrary decision was an unreasonable application of clearly established Supreme Court law.

\*    \*    \*

This case involves a heinous crime apparently committed by someone who suffered severe psychological trauma. Whether Thomas' psychological disturbances explain or in any way excuse his commission of murder, however, is beside the point. No jury deciding whether to recommend a death sentence should be tainted by potential racial biases that could infect its deliberations or decision, particularly where the case involved an interracial crime. Ignoring issues of racial bias in the jury system "damages 'both the fact and the perception' of the jury's role as 'a vital check against the wrongful exercise of power by the State.'" *Pena-Rodriguez* v. *Colorado*, 580 U. S. 206, 223 (2017).

This is not to impugn the individual jurors who served in this case, who may themselves have responded to questions

———————

[6] The Fifth Circuit declined to consider the prosecutor's comments in closing because a direct challenge to them fell beyond the scope of the certificate of appealability. 995 F. 3d, at 443. That confuses the issue. Separate from whether the closing argument itself was impermissible, the rhetoric and substance of the closing statement are part of the "totality of the evidence before the judge or jury" that a court must consider in assessing prejudice under *Strickland* v. *Washington*, 466 U. S. 668, 695 (1984).

honestly and with good intentions. It is ultimately the duty of the courts "to confront racial animus in the justice system." *Id.,* at 222. That responsibility requires courts, including this one, vigilantly to safeguard the fairness of criminal trials by ensuring that jurors do not harbor, or at the very least could put aside, racially biased sentiments. To address these "most grave and serious statements of racial bias" is "to ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy." *Id.,* at 224.

The errors in this case render Thomas' death sentence not only unreliable, but unconstitutional. I would not permit the State to execute Andre Thomas in light of the ineffective assistance that he received, and would summarily reverse the Fifth Circuit.